IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| LUCIA GONZALEZ-RODRIGUEZ, AND<br>NAZARIA LARA-MARTINEZ, *on behalf of*<br>*themselves and all other similarly situated persons*<br><br>Plaintiffs<br>v.<br>JOSE M. GRACIA, AND<br>JOSE M. GRACIA, HARVESTING, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO: _____<br><br><br>FIRST COMPLAINT FOR<br>DAMAGES, COSTS OF<br>LITIGATION, AND ATTORNEYS'<br>FEES |

## PRELIMINARY STATEMENT

1. This is an action by foreign migrant agricultural workers who lawfully entered the United States pursuant to 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c), and 1188(a)(1) ("the H-2A Program") to perform labor in agriculture in North Carolina for Jose M. Gracia Harvesting, Inc., and Jose M. Gracia ("Defendants") during the 2019 and 2020 agricultural seasons.

2. Plaintiffs bring this action to assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1, *et seq.* ("NCWHA"), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581 *et seq.* ("TVPRA"), North Carolina Human Trafficking Act N.C. Gen Stat.§ 14-43.18, and North Carolina common law.

3. With no fixed-site agricultural operation of their own, prior to the 2019 and 2020 seasons, Defendants, farm labor contractors, procured massive contracts to furnish labor to various North Carolina farms seeking the benefits of an H-2A workforce to harvest their crops without the costs of direct H-2A program participation.

1

4. Defendants contracted with the law firm of Andrew Jackson, Andrew Jackson Law ("Jackson Law") to act as the agent of Defendants in bringing in hundreds of workers from Mexico to engage in agricultural labor.

5. In recent years, Jackson Law has submitted many applications to the U.S. government on behalf of U.S. employers seeking to import workers from other countries to fill purported labor shortages, including dozens of applications under the H-2A visa program alone. As such, its sole member and manager, Andrew Jackson, a North Carolina-licensed attorney, is or should be very familiar with the regulations governing the H-2A program and the obligations that both he and his clients, the employers, must follow.

6. In order to bring workers into the United States on H-2A visas, Jackson Law and Defendants submitted documents to the U.S. government certifying, among other things, that all the Defendants would comply with federal law and pay their H-2A workers the Adverse Effect Wage Rate ("AEWR").

7. The Defendants then targeted foreign workers in Mexico whom they could convince to incur expenses of travel for the opportunity to work lawfully in the U.S., using false promises about the work, wages, and conditions the job provided. During recruitment, Defendants informed the applicants, including female applicants, that they would be working in the fields doing farm work.

8. The Defendants' fraudulent promise of reimbursement for travel costs left Plaintiff Gonzalez-Rodriguez in debt after she borrowed money to pay for the costs of travel to her workplace in North Carolina, which Defendants required Plaintiff Gonzalez-Rodriguez to cover.

9. When Plaintiffs left their hometowns in Mexico to travel hundreds of miles to North Carolina, Defendants then compelled Plaintiffs to work against their will in labor camp kitchens by

exploiting Plaintiffs' indebtedness, confiscating their identity and immigration documents, and cultivating a climate of fear through threats and deception.

10. Plaintiffs now bring claims against Defendants for unpaid wages, including minimum wages as required by the FLSA, promised wages under the NCWHA, and breach of their employment contract. Plaintiffs seek to bring a collective action pursuant to Section 216(b) of the FLSA. Plaintiffs further bring anti-trafficking claims under the TVPRA and North Carolina Human Trafficking statutes against Defendants for using threats, confiscating documents, and exploiting their vulnerable state to compel Plaintiffs' labor.

11. Plaintiff seeks damages, declaratory and injunctive relief, pre- and post-judgment interest, costs of the action, attorneys' fees, and other appropriate relief to make themselves whole for damages suffered due to the Defendants' violations of law.

## JURISDICTION

12. This Court has jurisdiction over this matter pursuant to:

    a.  28 U.S.C. § 1331 (Federal Question);

    b.  28 U.S.C. § 1337 (Interstate Commerce);

    c.  29 U.S.C. § 216(b) (FLSA);

    d.  18 U.S.C. § 1595(a) (TVPRA); and

    e.  28 U.S.C. § 1367 (Supplemental Jurisdiction).

13. This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiffs' FLSA and TVPRA claims that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

14. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because, at all times relevant to this Complaint, regular and substantial business activities of all Defendants occurred in Wayne, Johnston, Duplin, and surrounding counties in North Carolina, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims were committed within the jurisdiction of the Eastern District of North Carolina.

## PARTIES

### NAMED PLAINTIFFS

16. Plaintiff Lucia Gonzalez-Rodriguez is a citizen of Mexico, admitted to the U.S. on a temporary basis with a visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a), or the H-2A Program, to perform agricultural labor beginning in early October 2019.

17. In late September of 2019, Defendants recruited and employed Plaintiff Gonzalez-Rodriguez for work in or around Duplin, Wayne, and Johnston counties, North Carolina.

18. Plaintiff Nazaria Lara-Martinez is a citizen of Mexico, admitted to the U.S. on a temporary basis with a visa pursuant to the H-2A Program, to perform agricultural labor beginning in late May 2020. Upon her arrival, Plaintiff Lara-Martinez began performing agricultural work picking peppers for Defendant Jose M. Gracia Harvesting ("Gracia Harvesting") and working in a packinghouse for fixed-site employer Doug Wilson, owner and operator of DL&B Enterprises ("DL&B").

4

19. In late summer of 2020, Defendants informed Plaintiff Lara-Martinez's husband that Plaintiff Lara-Martinez would have to begin working in the labor camp kitchen at a labor camp located on Juniper Church Road, Four Oaks, Johnston County, North Carolina.

20. Throughout the entirety of that employment in 2019 and 2020, Defendants employed Plaintiffs to perform work for Defendants in and around Johnston, Wayne, and Duplin Counties, North Carolina, within the meaning of 29 U.S.C. §§ 203(d) and 203(g), N.C. Gen. Stat. §§ 95-25.2(3) and 95-25.2(5), and 20 C.F.R. §§ 655.103(b) and 655.1300(c), and jointly employed them within the meaning of 29 C.F.R. § 791.2.

21. At all times relevant to this Complaint, Plaintiffs' work involved commerce or the production of goods for commerce or work as an employee for an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A) of the FLSA.

<u>DEFENDANTS</u>

22. Defendant Gracia Harvesting is a corporation organized under the laws of the state of Florida in 1992. Maria V. Gracia, 48 Meadow Way, Frostproof, Fl 38843 is its registered agent for service of process.

23. Defendant Gracia Harvesting registered Gracia Harvesting with the State of North Carolina as a foreign corporation in March of 2015, listing its mailing address as 200 Juniper Church Road, Four Oaks, NC, 27524. Registering with North Carolina allowed Gracia Harvesting to do business in the State.

24. In 2019, Defendant Gracia Harvesting was registered with the U.S. Department of Labor ("USDOL") as a farm labor contractor and listed its address at 48 Meadow Way, Frostproof, FL 38848.

5

25. At all times relevant to this Complaint, Defendant Gracia Harvesting operated as a Farm Labor Contractor as defined by 29 U.S.C. § 1802(7) in that, for money or other valuable consideration paid or promised to be paid, it recruited, solicited, hired, furnished or employed migrant agricultural workers.

26. At all times relevant to this Complaint, Defendant Gracia Harvesting was a corporation "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

27. At all times relevant to this Complaint, Gracia Harvesting was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), and the FLSA, 29 U.S.C. § 203.

28. Defendant Jose M. Gracia, (hereinafter "Defendant Gracia") is registered with the USDOL as a Farm Labor Contractor.

29. At all times relevant to this Complaint, Defendant Gracia operated as a Farm Labor Contractor as defined by 29 U.S.C. § 1802(7) in that, for money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished, or employed migrant agricultural workers.

30. Defendant Gracia's most current Farm Labor Contractor through registration became valid on May 1, 2020 and it expired on April 29, 2021. That registration lists his residence as 48 Meadow Way, Frostproof, FL 38848.

31. Defendant Gracia now operates as a Farm Labor Contractor through Gracia & Sons, Inc. Gracia & Sons, Inc. incorporated in Florida on December 20, 2019. The agent is listed as Graciela Ream, 8960 Rhoden Loop Rd, Ft Meade, FL 33841.

6

32. Upon information and belief, in 2019, Defendant Gracia resided at least temporarily in Four Oaks, North Carolina in Johnston County.

33. At all times relevant to this Complaint, Defendant Gracia employed Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 203(d) and N.C. Gen. Stat. § 95-25.2(4), and he was an employer within the meaning of 20 C.F.R. § 655.103(b).

34. At all times relevant to this Complaint, Defendant Gracia was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

35. At all times relevant this Complaint, Defendants were joint and individual employers of Plaintiffs within the meaning of 29 U.S.C. §§ 203(d) and (g), N.C. Gen. Stat. §§ 95-25.2(3), and 20 C.F.R. §§ 655.103(b), 655.1300(c), and 29 C.F.R. § 791.2.

STATEMENT OF FACTS

DEFENDANTS' H-2A PROGRAM HISTORY

36. Defendants participated in the H-2A program as H-2A Labor Contractors in North Carolina since 2015.

37. Defendants have contracted with Andrew Jackson Law, a private law firm in Clinton, North Carolina, as the agent to prepare and file their North Carolina H-2A applications with the required federal and state agencies since 2015.

38. An agricultural employer in the United Sates may import foreign workers to perform labor of a temporary nature if the U.S. Department of Labor (USDOL) certifies that (1) there are insufficient available workers within the United States to perform the job and (2) the employment of foreign workers will not adversely affect the wages and working conditions of

similarly situated U.S. workers. Foreign workers admitted under this program are commonly known as "H-2A workers."

39. The application for certification with USDOL, called a "clearance order" or "job order," must comply with applicable regulations, used in the recruitment of both U.S. and H-2A workers. 20 CFR § 655.121(a)–(c). The H-2A regulations set the minimum benefits, wages, and working conditions that the employer must offer to avoid an adverse effect upon U.S. workers. 20 C.F.R. §§ 655.0(a)(2), 655.122, 655.135.

40. H-2A employers must therefore pay H-2A workers the Adverse Effect Wage Rate ("AEWR"), a minimum hourly rate for work performed. The AEWR is higher than the federal minimum wage and differs by state.

41. The AEWR pursuant to the H-2A contract in North Carolina in 2019 was $12.25 per hour, effective January 9, 2019. *See* 83 FR 66306 (Dec. 26, 2018). The AEWR pursuant to the H-2A contact in North Carolina in 2020 was $12.67, effective January 2, 2020. *See* 84 FR 69774 (Dec. 19, 2019).

42. The minimum daily subsistence amount to be paid or reimbursed to H-2A workers for food during their transportation from Mexico to the U.S. as published in the Federal Register was $12.46 in 2019 and $12.68 in 2020. *See* 85 Fed. Reg. 16134 (Mar. 20, 2020); 84 Fed. Reg. 10838 (Mar. 22, 2019).

43. An H-2A employer must offer and provide each worker three meals per day or provide the workers free and convenient cooking facilities. *See* 20 C.F.R. §655.122(g). Where the employer provides the meals, the job offer must state the charge, if any, to the worker for such meals.

44. The maximum amount an H-2A employer could charge workers for three meals per day in 2019 was $12.46. *See* Fed. Reg. 10838 (Mar. 22, 2019). The maximum amount an H-2A employer could charge workers for three meals per day in 2020 was $12.68. 85 Fed. Reg. 16134 (Mar. 20, 2020).

45. An investigation by the USDOL Wage and Hour Division ("WHD") found that, in its 2016 Delaware operations, the Defendant Gracia Harvesting failed to:

    a. Comply with H-2A recruitment requirements requiring that the job order specify the types of work the employees will be performing. The job order listed only farmworker and laborer positions, but Defendant Gracia Harvesting employed workers in supervisor, cook, and bus driver positions.

    b. Provide kitchen facilities or reasonably priced meals to the workers as required. Instead, the contractor required workers to purchase their meals and the average daily cost of meals exceeded the maximum amount allowed.

    c. Pay the wage rate as offered. Defendant Gracia Harvesting paid a piece rate instead of the hourly rate. As a result, total wages did not always meet the required minimum rate of $11.66 per hour.

    d. Keep accurate records of employees' hours and earnings.

    e. Provide or secure housing for workers as required. Defendant Gracia Harvesting housed workers in an overcrowded motel that lacked enough beds for the workers. *See* Exhibit E.

46. Defendants received the WHD Determination Letter detailing findings of its investigation on June 11, 2018.

9

47. On May 6, 2021, the Office of Administrative Law Judges for the U.S. Department of Labor issued a decision and order approving the Consent Findings filed by Defendants and the WHD. *See Administrator, Wage and Hour Division, U.S. Department of Labor v. Jose M. Gracia Harvesting, DBA Jose Gracia Harvesting*, (Case No.: 2021-TAE-00001). In the Consent Order, Defendant Gracia Harvesting agreed to pay $13,996.45 in back wages and had been assessed $4,906.80 in civil money penalties. *See* Exhibit E.

48. In 2016, 2017, 2018, 2019, 2020, and 2021, Defendants appointed Jackson Law as their agent for the purposes of, among other things, filing their H-2A clearance orders, and completing corresponding paperwork. A true and accurate copy of the clearance orders submitted by Jackson Law on behalf of Defendants are attached to Plaintiff's Complaint as Exhibit F.

49. In 2019, Defendants, through Jackson Law, submitted and received approval for three applications for Temporary Employment Certification, Form ETA-9142A ("2019 Applications") with a corresponding Agricultural and Food Processing Clearance Orders ETA 790A ("2019 Clearance Orders") seeking permission to bring in and employ 626 H-2A workers in 2019.

50. For each application, Defendants listed the Occupational Title, as defined by the Occupational Information Network O*NET/OES, as follows: Farmworkers and Labors, Crops.

51. Alleging a lack of available documented or U.S. citizen agricultural workers to provide a workforce to North Carolina farms, Defendants specifically filed a 2019 Clearance Order, Job Order 11112187, ("the 2019 Order") for 111 temporary foreign workers to cultivate and harvest sweet potatoes, melons, and cucumbers during the 2019 North Carolina agricultural season from September 1, 2019 until November 29, 2019. *See* Exhibit C.

52. In 2020, Defendants, through Jackson Law, submitted and received approval for three applications for Temporary Employment Certification, Form ETA-9142A ("2020 Applications"), with corresponding Agricultural and Food Processing Clearance Orders ETA 790A ("2020 Clearance Orders") seeking permission to bring in and employ 546 H-2A workers in 2019.

53. Alleging a lack of available documented or U.S. citizen agricultural workers to provide a workforce to North Carolina farms, Defendants specifically filed a 2020 Clearance Order, Job Order H-300-20069-388905 ("the 2020 Order") for 367 temporary foreign workers to work in tobacco, sweet potatoes, and cucumbers May 9, 2020 until November 23, 2020. *See* Exhibit D.

54. In the 2019 and 2020 Applications, Defendants certified their compliance with the assurances contained in 20 C.F.R. §§ 655.121, 655.122, and 655.135 including:

    a. the assurance that employees will be housed at no cost in approved housing that complies with local, state, and federal safety and health standards, 20 C.F.R. § 655.122(d);

    b. the assurance that Defendants would provide prospective members of their H-2A crew with a work contract containing all terms and conditions of employment, containing, at a minimum, all of the provisions required under 20 C.F.R. § 655.122, no later than the time at which the worker applied for a visa to work for them, 20 C.F.R. § 655.122(q);

    c. the assurance to pay all employees at least the highest of the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective

11

bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period, 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l);

d.  the assurance that Defendants would offer and provide each worker three meals per day at a cost no greater than the maximum daily charge set by the Department of Labor or provide the workers free and convenient cooking facilities, 20 C.F.R. § 655.122(g).

e.  the assurance that the employer would comply with all applicable Federal, State and local laws and regulations, including, but not limited to, the FLSA, Title VII of the Civil Rights Act, and the TVPRA, 20 C.F.R. § 655.135(e); and

f.  the assurance that the employer would maintain accurate and adequate records with respect to Plaintiffs' earnings, records reflecting the nature and amount of work performed, the hours Plaintiff worked each day, the rate of pay, and the amount of and reasons for any and all deductions taken from Plaintiffs' wages. 20 C.F.R. § 655.122(j).

55. Upon information and belief, Defendant Gracia signed the assurances contained in the 2019 Application on behalf of Defendant Gracia Harvesting.

56. USDOL approved the 2019 Applications and 2020 Applications which included the 2019 and 2020 Clearance Orders. The 2019 Clearance Orders and 2020 Clearance Orders listed housing locations including (1) 200 Juniper Church Rd., 210 Juniper Church Rd., and 220 Juniper Church Rd, located in Four Oaks, Johnston County, NC, 27524; and (2) 2617 Dobbersville Rd., Mt. Olive, Wayne County, NC.

57. In the 2019 Clearance Orders, as the owner of Defendant Gracia Harvesting, Defendant Gracia certified that all workers employed pursuant to that order would be paid the highest of the adverse effect wage rate, ($12.25 per hour) or the prevailing piece rate for all hours worked each workweek.

12

58. In the 2020 Clearance Orders, as the owner of Defendant Gracia Harvesting, Defendant Gracia certified that all workers employed pursuant to that order would be paid the higher of the adverse effect wage rate ($12.67 per hour) or the prevailing piece rate for all hours worked each workweek.

59. By signing the 2019 Order, Defendants knowingly included false and deceptive terms with intent to defraud. The false and deceptive terms included, but were not limited to, specifications that:

   a. Workers would harvest sweet potatoes, peppers, and melons, and workers would only engage in work incidental to the agricultural operation;

   b. Defendants would pay workers in accordance with the 2019 Order;

   c. Defendants would "furnish free and convenient cooking and kitchen facilities so workers may prepare their own meals" and "transportation to assure workers access to store where they can purchase groceries;"

   d. Defendants would pay $12.25 for each hour worked by workers employed pursuant to the Order;

   e. Defendants would give field workers the opportunity to earn piece-rate wages at or above the hourly wage;

   f. Defendants would abide by all federal and local employment laws, thereby including laws protecting against discrimination on the basis of sex; and

   g. the 2019 Order described the actual promised terms and conditions of the employment being offered and all the material terms and conditions of the job. *See* Exhibit B.

13

60. By signing the 2020 Order, Defendants knowingly included false and deceptive terms with intent to defraud. The false and deceptive terms included, but were not limited to, specifications that:

    a. Workers would be harvesting sweet potatoes, peppers, and melons, and workers would only engage in work incidental to the agricultural operations.

    b. Defendants would pay workers in accordance with the 2020 Order;

    c. Defendants would "furnish free and convenient cooking and kitchen facilities so workers may prepare their own meals" and "transportation to assure workers access to store where they can purchase groceries;"

    d. Defendants would pay $12.67 for each hour worked by workers employed pursuant to the Order;

    e. Defendant would give field workers the opportunity to earn piece-rate wages at or above the hourly wage;

    f. Defendants would abide by all federal and local employment laws, thereby including laws protecting against discrimination on the basis of sex; and

    g. the 2020 Order described the actual promised terms and conditions of the employment being offered and all the material terms and conditions of the job. *See* Exhibit C.

61. The Defendants knew the assurances were false at the time that they swore that the assurances were accurate.

62. The Defendants did not intend to comply with the assurances sworn to in the 2019 Application and Order.

63. The Defendants did not intend to comply with the assurances sworn to in the 2020 Application and Order.

14

64. In the 2019 and 2020 Applications, Defendant Gracia's assurances on behalf of Defendant Gracia Harvesting, attesting to their compliance, deliberately misrepresented Defendants' intent to comply with federal, state, and local laws because the USDOL would not have approved their application and accompanying order without the sworn assurances.

65. Defendants did not intend to comply with all applicable federal, state, and local employment-related laws, in that they did not intend to pay for workers' transportation, recruitment, and visa costs, as required by the FLSA, the NCWHA, and the H-2A regulations.

66. Defendants did not intend to comply with applicable federal and state employment laws, in that they confiscated workers' documents in violation of the TVPRA and the North Carolina Human Trafficking Act.

67. Defendants have engaged in a pattern and practice of confiscating workers passports, immigration documents, or other identity documents since 2016, in violation of the TVPRA.

68. Defendants had knowledge that Defendants' practice of confiscating or withholding workers' documents in the year was violation of federal law, specifically of the TVPRA.

69. Further, the information contained in the 2019 Order and 2020 Order was deceptive because it failed to properly disclose cooking and kitchen work and work not incidental to the agricultural operation.

70. Defendants' agents led Plaintiffs to believe they would be engaged in field work did not mention kitchen work.

71. Defendants specified in the 2019 and 2020 Orders that Gracia employees would be cooking their own meals and purchasing their own groceries, and Plaintiffs therefore had no reason to believe kitchen labor would be incidental to the agricultural operation.

15

72. Defendants charged more than the permissible daily maximum for less than three meals per day and sold other food in addition to the meals.

73. Defendants provided field workers only two meals, instead of the required three meals, at a rate higher than the maximum daily charge under 20 C.F.R. § 655.122(g), charging $14.00 per day in 2019 for two meals and around or about $15.00 per day in 2020 for two meals. Defendants charged for these meals by deducting money from field workers' pay. Defendants prohibited field workers from entering the kitchens, thereby denying the field workers use of the kitchens to opt out of the meal payments and prepare their own meals.

74. Defendants separately sold breakfast made and prepared by female H-2A workers (collectively, "Gracia cooks") to the rest of his predominantly male H-2A workforce in North Carolina, at a rate of $3 –10 per breakfast, depending on the size of the meal.

75. Gracia cooks, under the supervision and direction of Gracia supervisors, occasionally sold food and drinks to individuals who were not employees of Defendant Gracia Harvesting.

76. The Defendants did not intend for their H-2A workers' labor in the kitchen to be merely incidental to Defendant Gracia Harvesting's agricultural operation because Defendants could generate additional income from food sales by charging more than the permissible maximum, by selling breakfasts to workers at an additional cost, and by occasionally selling food to individuals who were not employees of Defendant Gracia Harvesting.

77. The Defendants' practice of charging field workers above the daily maximum for meals constituted a business outside the agricultural operation.

78. Defendants paid Gracia cooks for only a small fraction of the actual hours the Gracia cooks worked.

79. Though Defendants ensured compliance with federal law and non-discriminatory practices, Defendants took specific, discriminatory action against their female employees by requiring only female employees to work in kitchens.

80. By requiring only female employees to work in the labor camp kitchens, Defendants prevented those female employees the opportunity to higher, prevailing piece-rate wages available to fieldworkers.

81. Defendants attested to their compliance in the 2019 Application and Order and in the 2020 Application and Order, but Defendants deliberately misrepresented their intent to comply with federal, state, and local laws because USDOL would not have approved their application and accompanying order without the sworn assurances.

82. Upon information and belief, Defendants did not intend to comply with all applicable federal, state, and local employment-related laws, in that they did not intend to fully reimburse Plaintiff for her transportation, recruitment, and visa costs, as required by the FLSA, the NCWHA, and the H-2A regulations.

<u>FOREIGN RECRUITMENT OF PLAINTIFF GONZALEZ-RODRIGUEZ</u>

83. Defendants directed and utilized various agents in Mexico to recruit foreign workers for the 2019 Order, and one of these agents goes by the name of Felipe Bautista.

84. By and through their agent Felipe Bautista ("Bautista") in Mexico, Defendants recruited Plaintiff Gonzalez-Rodriguez to work for them in North Carolina during the 2019 agricultural season.

85. By and through their agent Bautista in Mexico, Defendants required Plaintiff Gonzalez-Rodriguez, as a condition of her employment, to front the costs of her inbound travel and visa costs, promising reimbursement for these costs.

86. Plaintiff Gonzalez-Rodriguez has limited literacy and speaks Spanish as a second language because her native language is Mixteco Bajo, an indigenous language spoken in the state of Oaxaca, Mexico.

87. Plaintiff Gonzalez-Rodriguez therefore could not understand the written contract, and Bautista explained the contents of the contract to her orally.

88. Defendants' agent Bautista enticed Plaintiff Gonzalez-Rodriguez to take on the costs of travel and visa fees through fraudulent and deceptive promises, misleading Plaintiff about the number of hours she would work and the wages she would receive.

89. Bautista's fraudulent and deceptive promises included, but were not limited to, work harvesting sweet potatoes at a pay of at least $12.25 per hour for each hour worked by Plaintiff Gonzalez-Rodriguez and a weekly work schedule ranging from 35-50 hours per week.

90. Defendants' agent Bautista promised Plaintiff Gonzalez-Rodriguez an H-2A visa to work in farm work for Defendants for a four-month period in North Carolina and Florida. He said that she could then return home to her family or have the possibility of an extension of up to a year if she wanted a visa extension after she arrived.

91. Relying on Defendants' promises to her, Plaintiff Gonzalez-Rodriguez obtained an interest-accruing loan from an acquaintance in her hometown to pay for the costs of travel and the visa fee.

92. Defendants' agent Bautista also met with Plaintiff Gonzalez-Rodriguez to collect information for her visa application including her home addresses in Mexico and her passport information.

93. Bautista and another Gracia agent required Plaintiff Gonzalez-Rodriguez to pay them about 5,000 Mexican pesos (about $211 U.S. dollars in 2019) prior to her trip to the U.S. Consulate in Monterrey.

18

94. Plaintiff Gonzalez-Rodriguez understood that this payment was to be allocated to the cost of the visa and any processing fees such as legal fees or paperwork associated with procuring the visa (hereinafter, the "visa-related fee").

95. Defendants' agents instructed workers, including Plaintiff Gonzalez-Rodriguez, on how to apply for and get an H-2A visa, when to depart from their hometowns to travel to Monterrey, Mexico, to obtain the visa, where to stay, when to report to the U.S. Consulate for the visa interview, how to conduct themselves in the interview, and when and how to depart for the job in North Carolina.

96. At the direction of the Defendants' agents in Mexico, Plaintiff Gonzalez-Rodriguez traveled from her village in the Mexican state of Oaxaca to the U.S. Consulate in Monterrey, Mexico, where she waited for her visa to be issued.

97. Plaintiff Gonzalez-Rodriguez incurred, at personal expense, the costs of travel from her home to the U.S. Consulate in Monterrey.

98. Because of the timing of this process, Plaintiff Gonzalez-Rodriguez also incurred, at personal expense, the costs of paying for lodging arranged by the Gracia Defendants for three nights in a hotel in Monterrey near the Consulate.

99. Plaintiff Gonzalez-Rodriguez participated in a visa interview at the U.S. Consulate where she provided answers that she believed to be truthful, based on the information Defendants provided to her.

100. Plaintiff Gonzalez-Rodriguez received a visa associated with the 2019 Order for two (2) months.

101. Plaintiff Gonzalez-Rodriguez traveled from Monterrey, Mexico, to the border near Laredo, Texas, in a bus arranged by Defendants.

19

102.    Defendants then transported Plaintiff Gonzalez-Rodriguez from the border near Laredo, Texas, to North Carolina.

103.    In total, in addition the visa-related fee, Plaintiff Gonzalez-Rodriguez incurred additional costs, at personal expense, including the cost of travel from her hometown to the U.S. Consulate in Monterrey, Mexico; transport within Monterrey; lodging in Monterrey awaiting the interview process; the border crossing fee; and meals during the four days of travel.

104.    Plaintiff Gonzalez-Rodriguez's inbound travel costs, in total, amounted to approximately $363.00 U.S. dollars.

105.    In total, Plaintiff Gonzalez-Rodriguez travelled for approximately four (4) days from the place where Defendants, through their agent Bautista, recruited her in Mexico to Defendants' job sites in North Carolina.

106.    The actual inbound travel expenses that Defendants required Plaintiffs to incur, such as the visa-related fees, were greater than Plaintiff Gonzalez-Rodriguez had anticipated. Plaintiff Gonzalez-Rodriguez exhausted her remaining funds to complete her trip to North Carolina for the job.

CONFISCATION OF PLAINTIFF GONZALEZ-RODRIGUEZ'S DOCUMENTS

107.    Plaintiff Gonzalez-Rodriguez arrived in North Carolina on or around October 4, 2019.

108.    Defendants transported Plaintiff Gonzalez-Rodriguez to a labor camp in Four Oaks, North Carolina, located at 200, 210, and 220 Juniper Church Rd. Four Oaks, Johnston County, NC 27524 (hereinafter the "Four Oaks Labor Camp").

109.    Defendant Gracia owned the Four Oaks Labor Camp at all relevant times and owned and lived in a house located at the labor camp.

20

110. The Four Oaks Labor Camp is in a rural area, accessible only by a dirt road running past and behind Defendant Gracia's house.

111. At the Four Oaks Labor Camp, Defendant Gracia collected the passports, Mexican credentials, and I-94 immigration documents of the arriving workers, including Plaintiff Gonzalez-Rodriguez's documents.

112. Defendant Gracia also required Plaintiff Gonzalez-Rodriguez to sign unexplained paperwork. Some of this paperwork was in English, neither in Spanish nor in Plaintiff Gonzalez-Rodriguez's native Mixteco Bajo.

113. Defendants did not provide Plaintiff Gonzalez-Rodriguez with explanations or copies of the documents Plaintiff Gonzalez-Rodriguez signed.

<u>ASSIGNMENT TO LABOR CAMP KITCHENS IN 2019</u>

114. Defendant Gracia performed farm labor contracting activities as defined by 29 U.S.C. § 1802(7) in that, for any money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished, or employed migrant agricultural workers for Defendant Gracia Harvesting's 2019 H-2A crew.

115. Immediately after Plaintiff Gonzalez-Rodriguez arrived, a Gracia Harvesting supervisor told Plaintiff Gonzalez-Rodriguez that she should work in kitchens like other women employed by Gracia Harvesting, instead of in the fields.

116. Upon information and belief, Defendant Gracia Harvesting only assigned female workers to work in the kitchen.

117. Plaintiff Gonzalez-Rodriguez did not see any women assigned to work in the fields and felt she had no real choice but to work in the kitchens with the other women.

21

118.    Plaintiff Gonzalez-Rodriguez worked for two days and two evenings in the Four Oaks kitchen with the other cooks and two supervisors who were known by the names Maria Camarillo ("Camarillo") and Veronica Covarrubias ("Covarrubias") (together, "the Gracia supervisors"). The Gracia supervisors and the Gracia cooks slept in a room next to the kitchen where they worked.

119.    During this time, the Gracia supervisors subjected the Gracia cooks to verbal abuse and yelling, calling them names which translate to "stupid" and "animal."

120.    Plaintiff Gonzalez-Rodriguez noticed that the Gracia supervisors especially targeted the youngest Gracia cook, Yesica Velasco-Lopez, and that Ms. Velasco-Lopez appeared frightened of Camarillo and Covarrubias.

121.    On her third day in North Carolina, Defendants transported Gracia supervisor Camarillo, Plaintiff Gonzalez-Rodriguez, and Ms. Velasco-Lopez to another labor camp located at 2617 Dobbersville Road, Mount Olive, NC. Workers employed by Defendants call this the Spanish language equivalent of "Monks Labor Camp" because the site appeared to be a former church.

122.    Camarillo informed Plaintiff Gonzalez-Rodriguez and Ms. Velasco-Lopez that they would work at both the Monks Labor Camp kitchen, the Four Oaks Labor Camp kitchens, and another Gracia Camp.

<u>LABOR AND WAGES</u>

123.    During Plaintiff Gonzalez-Rodriguez's first week and a half of work, she performed approximately 11 hours of work per day, for six days with tasks that included, but were not limited to: preparing food, packing lunches, accompanying a Gracia driver to deliver lunches to the Gracia field workers, assisting the Four Oaks Labor Camp cooks, preparing dinner for Gracia field workers, and cleaning.

22

124.    After Plaintiff Gonzalez-Rodriguez's first full week of work, she received her first two paychecks on October 13, 2019. Those paychecks failed to accurately state the hours of her work and failed to pay her for her hours worked.

125.    For example, one paycheck stated that Plaintiff Gonzalez-Rodriguez had worked thirty-two (32) hours during the week of October 7 and paid her only $400.17. Plaintiff Gonzalez-Rodriguez worked approximately sixty-six (66) hours during this period.

126.    Around this time, Covarrubias gave Plaintiff Gonzalez-Rodriguez a check from Gracia Harvesting for inbound travel costs, which amounted to only $136.55 instead of the total $363.00 Defendants owed her to fully reimburse her inbound travel expenses.

127.    After Plaintiff Gonzalez-Rodriguez's first week, Defendants required her to prepare breakfast and coffee and to sell breakfast items to the field workers, separate from the provided lunch and dinner, in addition to the work previously assigned to her.

128.    Once she began cooking and serving breakfast as well as lunch and dinner, Plaintiff Gonzalez-Rodriguez worked around eighteen (18) hours per day, six days per week, with an additional hour of work on Sundays.

129.    Defendants willfully failed to compensate Plaintiff Gonzalez-Rodriguez for all hours she worked throughout October and November.

130.    Further, the paystubs representing each of Plaintiff Gonzalez-Rodriguez's workweeks did not accurately reflect the hours Plaintiff Gonzalez-Rodriguez had worked. Each of these pay stubs showed only about thirty-two (32) hours worked.

131.    For example, for the week of November 4, Defendants, Gracia supervisors paid her only $450 for each of this week.

132.  This paystub for the week of November 4 did not accurately reflect the hours Plaintiff Gonzalez Rodriguez had worked. Plaintiff Gonzalez-Rodriguez was still working one hundred eight (108) hours per week during this period, and the paystub stated that Plaintiff Gonzalez-Rodriguez had worked about 36 hours in that workweek.

133.  Defendants gave the Gracia kitchen workers' paychecks to the Gracia supervisors, and the Gracia supervisors cashed the checks for the Gracia kitchen workers and paid them in cash with the accompanying paystubs.

134.  When the Gracia supervisors cashed Plaintiff Gonzalez-Rodriguez's checks in November, they failed to pay her the full amount from the cashed check.

135.  Defendants required Plaintiff Gonzalez-Rodriguez to submit the revenue collected from selling breakfast to the Gracia supervisors or Defendant Gracia.

136.  Although the 2019 Clearance Order stated that all workers would have access to the kitchens and opportunities to purchase groceries, Defendants did not permit field workers to enter or use the labor camp kitchens except on Sundays.

137.  Defendants charged Gracia fieldworkers around or about $14 per day for lunch and dinner each day, instead of the required amount of $12.25 per day for three meals each day.

138.  Upon information and belief, fieldworkers who were not Gracia employees could purchase food from the Gracia cooks in the fields. The Gracia supervisors required the Gracia cooks to then relinquish the collected money to them.

139.  On December 8, 2019, Plaintiff Gonzalez-Rodriguez, by and through her attorneys, sent a formal written request for her pay records to Defendants and Jackson Law.

140.  Pursuant to 20 C.F.R. § 655.122(j)(2), Defendants had 72 hours to provide Plaintiff Gonzalez-Rodriguez with the requested records.

141.    Defendants received this request on December 10, 2019.

142.    On May 5, 2020, Plaintiff Gonzalez-Rodriguez again requested her pay records from Defendants.

143.    As to the date of this filing, Defendants have not provided Plaintiff Gonzalez-Rodriguez with any of the requested pay records, in violation of 20 C.F.R. § 655.122(j)(2).

<u>LIVING AND WORKING CONDITIONS</u>

144.    The Gracia supervisors prohibited Plaintiff Gonzalez-Rodriguez from taking regular breaks to eat or drink water.

145.    The Gracia supervisors prohibited breaks for the Gracia cooks and berated, yelled, and insulted cooks if they did not work quickly enough to their satisfaction.

146.    Plaintiff Gonzalez-Rodriguez often felt weak due to dehydration and malnourishment.

147.    At one point, Plaintiff-Gonzalez-Rodriguez became ill and noticed rashes and blotches on her skin.

148.    When Plaintiff Gonzalez-Rodriguez reported to Camarillo that she felt too ill to continue working and showed her the blotches on her skin, Camarillo said "you are here to work, not to be sick" (translated from Spanish).

149.    Upon information and belief, Defendants failed to report Plaintiff Gonzalez-Rodriguez's illness to the local health department in violation of regulating government migrant housing. 15A N.C Admin. Code 18A.2114(4)(B)(2008).

150.    Camarillo and a male Gracia supervisor refused to allow Plaintiff Gonzalez-Rodriguez to seek medical care, and instead required her to continue her food-preparation duties.

<u>SEXUAL HARRASSMENT AND ASSAULT</u>

151.    Defendants caused Plaintiff Gonzalez-Rodriguez to feel unsafe at the labor camps.

152. One night, after Plaintiff Gonzalez-Rodriguez finished working, a Gracia driver named Adán, who appeared intoxicated, followed Plaintiff Gonzalez-Rodriguez to her room, pushed himself into the room, prevented her from leaving, and forcibly raped her.

153. Plaintiff Gonzalez-Rodriguez cried and audibly protested but received no assistance.

154. Plaintiff Gonzalez-Rodriguez's room was located adjacent to Gracia supervisor Camarillo's room, and sound carried through the walls. Plaintiff Gonzalez-Rodriguez had earlier observed Camarillo entering her adjacent room.

155. Plaintiff Gonzalez-Rodriguez informed Gracia supervisor Camarillo that she was experiencing pelvic pain the following morning, and Camarillo provided Plaintiff Gonzalez-Rodriguez with a pill and told her she needed to take it.

156. Plaintiff Gonzalez-Rodriguez did not know what to do after the assault because Defendants had not provided any information regarding a sexual harassment policy.

157. On several occasions before and after the rape, Plaintiff Gonzalez-Rodriguez observed Camarillo and Adán talking and laughing with each other.

158. Camarillo's friendly relationship with Adán caused Plaintiff Gonzalez-Rodriguez to believe Camarillo would side with him if she complained.

FORCE, FRAUD, AND COERCION

159. Despite the long hours, poor working conditions, and unsafe environment, Plaintiff Gonzalez-Rodriguez felt compelled to continue providing labor for Defendant Gracia Harvesting.

160. Defendants were still in possession of Plaintiff Gonzalez-Rodriguez's passport during her first weeks with Defendant Gracia Harvesting.

161. Plaintiff Gonzalez-Rodriguez feared the Gracia supervisors because of their disregard for their contractual obligation to pay her as promised and because of the threatening and abusive behavior she received and witnessed done to others.

162. On Plaintiff Gonzalez-Rodriguez's first day, she observed the Gracia supervisors yelling and gesturing aggressively at Ms. Velasco-Lopez until Ms. Velasco-Lopez cried.

163. On Plaintiff Gonzalez-Rodriguez's first Sunday, the Gracia supervisors and a Gracia driver brought the Gracia cooks to a laundromat.

164. Plaintiff Gonzalez-Rodriguez's coworker, Ms. Velasco-Lopez, managed to escape with help from a local resident when the Gracia supervisors briefly left the Gracia cooks alone in the laundromat.

165. The Gracia supervisors interrogated the kitchen workers, including Plaintiff Gonzalez-Rodriguez, asking where Ms. Velasco-Lopez went, and Covarrubias yelled so loudly that Plaintiff Gonzalez-Rodriguez feared she might become physically violent.

166. The Gracia supervisors told Plaintiff Gonzalez-Rodriguez and the other kitchen workers that they had to promise not to leave. Covarrubias did not stop yelling until Plaintiff Gonzalez-Rodriguez affirmatively told her "I won't leave. I'm here to work" (translated from Spanish).

167. After Ms. Velasco-Lopez escaped, the Gracia supervisors forbade the Gracia cooks to go anywhere without supervision and required the kitchen workers to wash their laundry by hand in outdoor tubs at the labor camps, instead of leaving the labor camp to go to a laundromat.

168. Moreover, Plaintiff Gonzalez-Rodriguez discovered that she would not be fully reimbursed for her travel costs and so she would need to earn enough money to pay off her debt in Mexico upon receipt of her reimbursement check.

27

169.   The Gracia supervisors grew increasingly aggressive towards the Gracia cooks, yelling at them and berating them over insignificant issues.

170.   Gracia supervisor Camarillo became violent with Plaintiff Gonzalez-Rodriguez on multiple occasions.

171.   On one occasion, Camarillo threw a water bottle at Plaintiff Gonzalez-Rodriguez to urge her to work more quickly.

172.   Camarillo also prodded Plaintiff Gonzalez-Rodriguez with hot objects, once holding a lighter to Plaintiff Gonzalez-Rodriguez's chest, and, on another instance, a hot tray to her head.

173.   On another occasion, Camarillo shoved Plaintiff Gonzalez-Rodriguez against the gas stove while it was burning. The flame singed Plaintiff Gonzalez-Rodriguez's shirt and burned her arm.

174.   When Plaintiff Gonzalez-Rodriguez was bent over the stove while working one day, Camarillo reached over to the burner switch and turned to the highest setting. Plaintiff Gonzalez-Rodriguez had to jump backwards to avoid the flame.

175.   While the supervisor's verbal and physical violence began to escalate, Defendants still possessed of Plaintiff Gonzalez-Rodriguez's identity documents.

176.   The Gracia supervisors rarely permitted Plaintiff Gonzalez-Rodriguez to leave the labor camp grounds, and, even when they did, they required her to remain accompanied by one of the Gracia supervisors or a Gracia driver.

177.   The Gracia supervisors told Plaintiff Gonzalez-Rodriguez that, if she left, the police would arrest her for "breaking her contract" (translated from Spanish).

178.   The Gracia supervisors told Plaintiff Gonzalez-Rodriguez that police or immigration officials would arrest her if she got on a bus in an effort to leave her employment.

179. When another Gracia cook expressed unhappiness and discomfort, the Gracia supervisors told the Gracia cooks that Defendant Gracia could report them to the police and that Defendant Gracia had many contacts in Mexico and in U.S. immigration enforcement.

180. Plaintiff Gonzalez-Rodriguez understood this to mean that Defendant Gracia would and could retaliate with arrest, deportation, or extrajudicial force if she reported the wage theft or if she left her contract early.

181. Camarillo told Plaintiff Gonzalez-Rodriguez that leaving or complaining would be a betrayal to Defendant Gracia and that Defendant Gracia could then report her to law enforcement.

182. The Gracia supervisors' threats led Plaintiff Gonzalez-Rodriguez to believe it was a crime for her to stop working for Defendants before the end of her contract and therefore to believe she could go to jail for leaving.

183. The Gracia supervisors spoke of Defendant Gracia as a very powerful person, and Plaintiff Gonzalez-Rodriguez was afraid her family in Mexico might be harmed because Camarillo and Felipe Bautista were from Plaintiff Gonzalez-Rodriguez's hometown.

184. Plaintiff Gonzalez-Rodriguez tried to work harder after hearing these threats because she the feared consequences of displeasing Defendant Gracia or his supervisors.

185. Plaintiff Gonzalez-Rodriguez knew that the Gracia supervisors had worked with Defendant Gracia for several years and observed him inviting them to dinner on two occasions. She therefore believed that the Gracia supervisors reported details about the conversations of the Gracia cooks.

186. The words, actions, and behavior of the Defendants, their agents, and their supervisors caused Plaintiff Gonzalez-Rodriguez to believe that she might experience financial harm,

arrest, deportation, physical harm to herself or her family, or other forms of retaliation if she did not continue providing labor for the Defendants.

## ESCAPE & ONGOING FEAR

187.    On October 31, 2019, Legal Aid of North Carolina Farmworker Unit visited the Monks Labor Camp and dropped off community education materials.

188.    After Legal Aid of North Carolina left, Camarillo yelled at Plaintiff Gonzalez Rodriguez and told her not to escape or try to go home. Camarillo said that if Plaintiff Gonzalez-Rodriguez tried to escape, Camarillo would report her to Defendant Gracia. Camarillo informed her that Defendant Gracia would call the police to have them "pick up" Plaintiff Gonzalez-Rodriguez (translated from Spanish) if she tried to leave.

189.    Shortly after Legal Aid's visit, Plaintiff Gonzalez-Rodriguez contacted Ms. Velasco-Lopez one night to ask her for help in escaping, and Ms. Velasco-Lopez provided her with the contact information of the local resident who had helped Ms. Velasco-Lopez escape.

190.    Around 3am on or about November 20, 2019, after Camarillo went to bed, Plaintiff Gonzalez-Rodriguez packed her suitcase and left, running through the rain, down the dirt road out of the labor camp, to the main road.

191.    Plaintiff Gonzalez-Rodriguez called Ms. Velasco-Lopez's contact for help and hid, waiting under a tree, until the local resident arrived to pick her up later in the morning.

192.    After leaving the labor camp, Plaintiff Gonzalez-Rodriguez feared retaliation from Defendants in North Carolina or in Mexico.

193.    Gonzalez-Rodriguez instructed her relatives in Mexico to move her mother and children to another city to protect them. She was concerned that agents or contacts of Defendant Gracia would find and harm her family.

30

## RECRUITMENT OF PLAINTIFF LARA-MARTINEZ

194. Defendants recruited Plaintiff Lara-Martinez to work in their kitchens during the 2020 agricultural season.

195. Plaintiff Lara-Martinez's husband, Abel Alvarado, had worked as a mechanic for the Defendants on an H-2A visa in Florida during prior agricultural seasons.

196. Defendants, by and through their agents, promised Plaintiff Lara-Martinez $12.77 per hour, plus any additional piece-rate earnings, for work harvesting peppers and sweet potatoes in North Carolina during 2020.

197. Plaintiff Lara-Martinez had performed fieldwork on an H-2A visa for the Defendants in the past in the state of Florida, and she believed she would again perform fieldwork for the Defendants in North Carolina.

198. Plaintiff Lara-Martinez, relying on these promises, traveled with Mr. Alvarado to Monterrey, Mexico, from her hometown in Veracruz, Mexico. to interview at the U.S. Consulate.

199. After obtaining her visa, Plaintiff Lara-Martinez and her husband traveled to North Carolina with other Gracia H-2A workers.

## ARRIVAL TO FOUR OAKS LABOR CAMP

200. Plaintiff Lara-Martinez and her husband arrived at Four Oaks Labor Camp, the same camp where Plaintiff Gonzalez-Rodriguez arrived, on June 12, 2020.

201. Upon her arrival, Defendant Gracia confiscated her passport, Mexican identification card, and her I-94 immigration form. He did not return these documents for several weeks.

31

202.   Defendant Gracia then informed Plaintiff Lara-Martinez that she would have to work in a packing house ("the DL&B Packingshed") operated by the grower DL&B in the mornings before working in the fields

203.   Doug and Linda Wilson own and operate DL&B Enterprises, Inc., incorporated in North Carolina in 1991.

204.   Defendants transported Plaintiff Lara-Martinez, along with other workers, to stay at a labor camp in Clinton, Sampson County, North Carolina near the packingshed ("the Clinton Labor Camp").

205.   Plaintiff Lara-Martinez understood that she did not have a choice and that working in the packingshed was a requirement.

206.   Plaintiff Lara-Martinez did not have the opportunity to earn a prevailing piece-rate wage while working in the packingshed.

207.   Doug Wilson ran and supervised the packingshed where she worked and gave instructions to Plaintiff Lara-Martinez via his DL&B supervisors.

208.   On most days, Plaintiff Lara-Martinez and other women had to work between three-and-a-half to six-and-a-half hours packaging chiles and other vegetables and packing meals at the packingshed near the DL&B Labor Camp. They did this in the mornings before going to work in the fields.

Defendants then transported Plaintiff Lara-Martinez to the fields to work for another seven hours with other fieldworkers under the supervision of a Gracia supervisor named "Juan Carlos." Juan Carlos forbade Plaintiff Lara-Martinez from clocking in and out herself. He clocked in and out for her.

## PLAINTIFF LARA-MARTINEZ'S ASSIGNMENT TO KITCHENS

209.    On or around August 1, 2020, Defendant Gracia instructed Mr. Alvarado to tell his wife, Plaintiff Lara-Martinez, that she would have to move to the Four Oaks Labor Camp and work in the Gracia kitchens.

210.    Upon information and belief, Defendant Gracia only assigned female workers to the kitchen labor.

211.    Covarrubias was a supervisor of the Four Oaks kitchens in 2021. Camarillo, assigned to supervise another Gracia kitchen, occasionally worked at Four Oaks and reported back to Covarrubias.

## LABOR & WAGES

212.    Plaintiff Lara-Martinez did not receive the promised piece-rate at or above the hourly wage during her time performing fieldwork.

213.    Plaintiff Lara-Martinez received pay of $12.67 per hour when she split her time between the packingshed and the fields, but this changed after she was assigned to the kitchens full-time.

214.    The Defendants required Plaintiff Lara-Martinez to work in the kitchens from approximately 6am-11pm everyday Monday through Saturday. On Sundays, she worked four to five hours.

215.    Plaintiff Lara-Martinez's work included preparing meals, selling breakfast, turning over money from breakfast sales to the Defendants, traveling to the fields and other Gracia labor camps to serve lunches to the field workers, cleaning up after meals, and maintaining the kitchen.

33

216. On some occasions, workers purchased juices and soft drinks from the Gracia kitchens. These purchases, upon information and belief, were sold for the Defendants' profit.

217. Occasionally, workers whom Plaintiff Lara-Martinez did not recognize as Gracia employees purchased refreshments from the Gracia cooks.

218. Fieldworkers were not allowed to use the labor camp kitchens, and only lunch and breakfast were included in their meal plan.

219. Gracia supervisor Covarrubias required Plaintiff Lara-Martinez to turn over the money from selling breakfast to her or to Defendant Gracia.

220. Gracia kitchen supervisor, Covarrubias, did not allow breaks for lunch or for rest.

221. In total, Plaintiff Lara-Martinez worked as a Gracia cook approximately 106-107 hours per week, but she received only about $550 per week.

FORCE, FRAUD AND COERCION

222. Covarrubias would not allow Plaintiff Lara-Martinez time to speak with her husband or breaks to eat full meals

223. The other Gracia cooks and Plaintiff Lara-Martinez were often hungry.

224. Plaintiff Lara-Martinez and the other kitchen workers could not leave the camps or fields. The camps are in remote locations and the workers depended on Gracia drivers and supervisors for all transportation.

225. Plaintiff Lara-Martinez feared complaining or quitting because of how the Defendants treated workers, including the way Gracia supervisor Covarrubias's physical and verbal aggression towards Gracia cooks.

226. One day, Covarrubias repeatedly shoved and pushed another kitchen worker until that worker fell on the ground, thereby intimidating all the other women working in the kitchen.

227. Covarrubias often shouted, yelled, and gestured threateningly at the kitchen workers, and Plaintiff Lara-Martinez understood Covarrubias's behavior to communicate that Covarrubias would become physically violent if the kitchen workers did not follow instructions in a way that pleased Covarrubias.

228. Gracia supervisor Covarrubias threatened to "report" (translated from Spanish) the workers if they did not work quickly enough to satisfy her.

229. Plaintiff Lara-Martinez did not know what being "reported" meant, but she feared deportation and other consequences for her husband or for herself if she displeased Covarrubias.

230. Plaintiff Lara-Martinez believed that Defendants and their agents could and would retaliate against her or her husband because of the ease in which they falsified her paystubs and controlled workers' hours and movement.

231. Gracia supervisors had suggested to Plaintiff Lara-Martinez in the past that Defendant Gracia had retaliated against workers who quit or complained by telling other H-2A contractors to refuse to hire them in the future.

232. The Gracia supervisors used the stories of retaliation to cause Plaintiff Lara-Martinez to believe that if she complained or quit, she would never be able to find an H-2A job in the future, and her husband would lose his job, his reputation, and future job opportunities.

233. The Defendants had Plaintiff Lara-Martinez's contact and biographical information, and Plaintiff Lara-Martinez believed they would make a false report to immigration or to law enforcement if she quit.

234.    Mr. Alvarado grew worried for Plaintiff Lara-Martinez because of their limited chances to communicate, and upon discovering how Covarrubias treated Plaintiff Lara-Martinez, Mr. Alvarado wanted to leave with her.

235.    Though Plaintiff Lara-Martinez feared financial, reputational, and legal harm for her husband and herself, Mr. Alvarado convinced her to leave Defendants' employment and to seek out help from some trusted local friends.

236.    Both Plaintiff Lara-Martinez and her husband fear retaliation and have attempted to avoid any contact with Defendant Gracia and his agents since Plaintiff Lara-Martinez's escape.


**FLSA COLLECTIVE ACTION ALLEGATIONS**

237.    During the course of Plaintiffs' employment, Defendant Gracia Harvesting:

      i.    Failed to fully reimburse Plaintiff Gonzalez-Rodriguez at the for reasonable costs incurred by her for transportation and daily subsistence from Plaintiff Gonzalez-Rodriguez's home in Mexico to Defendant Gracia Harvesting's labor camps in North Carolina.

     ii.    Failed to pay compensate Plaintiffs for all of their hours' worked at rates equal to the higher of the AEWR, the prevailing hourly wage rate, or the FLSA minimum wage;

   iii.    Failed to pay Plaintiffs overtime wages for labor not incidental to the agricultural operation and therefore exempt from the FLSA overtime exemption;

36

iv.  Failed to maintain accurate and adequate records with respect to Plaintiffs' earnings, records reflecting the nature and amount of work performed, the hours Plaintiff worked each day, the rate of pay, and the amount of and reasons for any and all deductions taken from Plaintiffs' wages;

v.  Forced Plaintiffs to work in the labor camp kitchens, which was work not incidental to the agricultural operation; and

vi.  Failed to comply with all federal and state employment-related laws, specifically federal and state laws protecting against discrimination on the basis of sex, thereby causing female workers to have less favorable working conditions and to forfeit the opportunity to earn piece-rate wages over the hourly wage.

vii.  Defendants' actions were willful.

238.  During their employment, when paid on an hourly basis, Plaintiffs' earnings from the Gracia Defendants totaled less than the amount due under the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a).

239.  At the end of various workweeks, Defendants did not pay Plaintiffs at least the minimum wage for each workweek during which Plaintiffs were employed. Plaintiffs are thus entitled to relief pursuant to the FLSA, 29 U.S.C. § 216(b).

240.  For example, Plaintiffs often worked more 100 hours per week, but were paid less than a minimum of $725 for that workweek, meaning that their hourly wages fell below $7.25 per hour.

241. The Gracia Defendants falsified their records of employees' hours worked by under-reporting the number of hours Plaintiffs, worked to avoid paying the contract wage and FLSA minimum wage.

242. Defendants failed to maintain pay records as required by the FLSA, 29 U.S.C. § 211(c).

243. Plaintiffs Gonzalez-Rodriguez and Lara-Martinez bring this claim under the FLSA pursuant to the collective action procedure specified in 29 U.S.C. § 216(b) for themselves and for all other similarly situated persons who were or will be employed by Defendants at any time in the time period starting with the first date in the 3-year time period, immediately preceding the date on which such person files a Consent to Sue in this action pursuant to 29 U.S.C. § 216(b), and ending with the date final judgment is entered in this action. *See* Exhibits A, B.

244. This FLSA collective action is for all workweeks in which Plaintiffs and the members of this FLSA collective action described in paragraphs 16 through 22 were or will not be paid at the hourly rate required by 29 U.S.C. § 206.

245. This collective action is based upon the willful failure of Defendants to pay Plaintiffs Gonzalez-Rodriguez and Lara-Martinez and the members of this collective action wages free and clear on or before their regular payday for each workweek at the minimum wage rate required by 29 U.S.C. § 206, for each hour or part of an hour worked by Plaintiffs and members of the collective action.

## **FIRST CLAIM FOR RELIEF**

### (FAIR LABOR STANDARDS ACT: MINIMUM WAGE)

246. Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

247. Plaintiffs bring this claim for Defendants' violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq,* on behalf of themselves and all others similarly situated.

248. Plaintiffs have consented in writing to bring this FLSA action and have filed their written consents with this Complaint, labeled as Exhibits A through B.

249. Defendants violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiffs Gonzalez-Rodriguez, Lara-Martinez, and the members of the collective action described in Paragraphs 16-21 at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in each workweek during which they were employed.

250. The violations of the minimum wage provisions of the FLSA resulted, in part, from Defendants' willful failure to fully reimburse Plaintiffs Gonzalez-Rodriguez and members of the collective action during their first week of employment for expenses incurred primarily for the benefit of Defendants, including their in-bound subsistence costs, lodging expenses near the U.S. Consulate, visa fees and visa-related processing fees, issuance of Form I-94, and the full cost of travel from their homes to Defendants' jobsite.

251. When these in-bound expenses are calculated as deductions from their first week's pay, as required by law, they cause the first-week wages of Plaintiff Gonzalez-Rodriguez and the members of the collective action to be less than the FLSA minimum wage.

252. The violations of the minimum wage provisions of the FLSA also resulted from Defendants' failure during various weeks to compensate Plaintiffs Gonzalez-Rodriguez, Lara-

39

Martinez, and members of the collective action at the minimum wage rate for all hours worked when Defendants paid Plaintiffs Gonzalez-Rodriguez, Lara-Martinez, and members of the collective action less than the minimum wage.

253. Upon information and belief, Defendants knew that they were required to pay Plaintiffs Gonzalez-Rodriguez, Lara-Martinez, and members of the collective action at least the Federal minimum wage for each hour worked during a workweek. As such, Defendants' failure to pay Plaintiffs Gonzalez-Rodriguez, Lara-Martinez, and members of the collective action the minimum wage was willful within the meaning of 29 U.S.C. § 255.

254. Consistent with the findings in the 2016 WHD investigation, in the years 2019 and 2020, Defendants did not:

    a. Comply with H-2A recruitment requirements by employing workers in supervisor, cook and driver positions when the job order listed only farmworkers and laborers positions;

    b. Provide kitchen facilities or meals to the workers as required. Instead, the contractor required workers to purchase their meals and the average daily cost of meals exceeded the maximum amount allowed;

    c. Pay the wage rate as offered;

    d. Keep accurate records of employees' hours and earnings; or

    e. Provide or secure housing for workers as required. *See* Exhibit E.

255. As a consequence of Defendants' willful violation of their rights under the FLSA, Plaintiffs Gonzalez-Rodriguez and Lara-Martinez, seek unpaid minimum wages, plus an equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and the members of the collective action.

## SECOND CLAIM FOR RELIEF

### (FAIR LABOR STANDARDS ACT: OVERTIME)

256.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

257.    Defendants willfully failed to pay Plaintiffs Gonzalez-Rodriguez and Lara-Martinez at least one-and-a-half times the regular rate of pay and for each hour that Plaintiffs performed non-agricultural labor for Defendants in excess of 40 hours in each workweek, in violation of 29 U.S.C. § 207.

258.    This violation of FLSA resulted in part from the Defendants' requiring Plaintiffs to perform kitchen labor that was not merely incidental to the agricultural operation, but rather was a separate business rendering an additional profit for Defendants by food sales which exceeded the maximum set by federal regulations, additional sales for "breakfast food" and other food and drink items, and food sales to workers not employed by Defendant Gracia Harvesting.

259.    Upon information and belief, Defendants knew that they were required to sell food at or below the maximum set by Federal regulations, and the labor of Plaintiffs Gonzalez-Rodriguez, Lara-Martinez, and members of the collective action were therefore not merely incidental to the agricultural operation. As such, Defendants' failure to pay Plaintiffs Gonzalez-Rodriguez, Lara- Martinez, members of the collective action overtime at a rate of one-and-a-half times the promised wages was willful.

260.    As a consequence of Defendants' willful violation of their rights under the FLSA, Plaintiffs Gonzalez-Rodriguez and Lara- Martinez, seek unpaid minimum wages, plus an

equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and the members of the collective action.

**THIRD CLAIM FOR RELIEF**

(NORTH CAROLINA WAGE AND HOUR ACT)

261.   Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

262.   Defendants failed to pay Plaintiffs Gonzalez-Rodriguez and Lara-Martinez at least the promised wage and each hour or part of an hour that Plaintiffs worked for Defendants for each workweek, in violation of N.C. Gen. Stat. § 95-25.6.

263.   The promised wage for Plaintiffs was the effective AEWR.

264.   The violations of the NCWHA resulted, in part, from Defendants' failure to reimburse Plaintiff Gonzalez-Rodriguez during her first week of employment for expenses incurred primarily for the benefit of Defendants, including recruitment fees, her inbound subsistence costs, lodging expenses near the U.S. Consulate, visa fees and visa-related processing fees, issuance of Form I-94, and the full cost of travel from her home to Defendants' jobsite. When these expenses are calculated as deductions from their first week's pay, as required by law, they cause Plaintiff Gonzalez-Rodriguez and the members of the collective action's first week's earnings to be less than the AEWR promised to them.

265.   The violations of the NCWHA also resulted from Defendants' failure during various weeks to compensate Plaintiffs Gonzalez-Rodriguez and Lara-Martinez at the AEWR for all hours worked.

42

266. As a result of these actions, Defendants are in violation of Plaintiff Gonzalez-Rodriguez's and Lara-Martinez's rights under N.C. Gen. Stat. §§ 95-26.6. Plaintiffs have suffered damages in the form of unpaid wages and liquidated damages that may be recovered from Defendants, jointly and severally, under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a)(1).

## FOURTH CLAIM FOR RELIEF

### (NORTH CAROLINA COMMON LAW BREACH OF CONTRACT)

267. Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

268. Plaintiffs Gonzalez-Rodriguez and Lara Martinez bring this claim against Defendants for damages resulting from the Defendants' breach of their employment contracts as embodied in the 2019 and 2020 Orders.

269. The terms and conditions of employment contained in the 2019 and 2020 Orders constituted the employment contracts between Defendants and the H-2A workers, including Plaintiffs Gonzalez-Rodriguez and Lara-Martinez, the terms of which were supplied by federal regulations at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

270. Defendants offered employment under the terms and conditions set out in the 2019 and 2020 Application for Temporary Labor Certification and accompanying job orders.

271. Plaintiffs Gonzalez-Rodriguez and Lara-Martinez accepted Defendants' offers.

272. Defendants breached their employment contracts with Plaintiffs Gonzalez-Rodriguez and Lara-Martinez by providing terms and conditions of employment that were materially different from those in the respective 2019 or 2020 Job Orders.

273. The Defendants breached their employment contracts with Plaintiff Gonzalez-Rodriguez by failing to provide timely, full reimbursement for her inbound travel costs to the place of employment.

274. The Defendants breached their employment contract with Plaintiff Gonzalez-Rodriguez by failing to pay her the promised AEWR of $12.25 for each compensable hour of work in a workweek.

275. Defendants breached their employment contract with Plaintiff Lara-Martinez by failing to pay her the promised AEWR of $12.67 for each compensable hour of work in a workweek.

276. Defendants breached their employment contracts with Plaintiffs by failing to pay them at least the applicable Federal minimum wage for each compensable hour of work in a workweek.

277. Defendants breached their employment contract with Plaintiffs by failing to accurately record their hours worked.

278. Defendants breached their employment contracts with Plaintiffs Gonzalez-Rodriguez and Lara-Martinez by failing to comply with federal laws prohibiting discrimination on the basis of sex, and thereby denying them the opportunity to earn piece-rate wages in additional to over the minimum hourly wage by working in the fields.

279. Defendants breached their employment contracts with Plaintiff Gonzalez-Rodriguez by failing to comply with federal laws mandating a sexual harassment policy for employers with 500 employees or more.

280. Defendants' breach of their employment contracts with Plaintiffs caused substantial injuries.

281. Defendants are liable to Plaintiffs for the damages that arose naturally and according to the usual course of things from Defendants' breach, as provided by federal common law and North

44

Carolina common law, including unpaid wages, lost opportunity to earn a prevailing wage, damages arising from the delay, and prejudgment interest.

282.   Defendants' breach of their employment contracts with Plaintiffs caused substantial injuries.

283.   Defendants are liable to Plaintiffs for the damages that arose naturally and according to the usual course of things from the Defendants' breach, as provided by federal common law and North Carolina common law, including unpaid wages, damages arising from the delay, and prejudgment interest.


**FIFTH CLAIM FOR RELIEF**

(TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ["TVPRA"] -

FORCED LABOR)

284.   Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

285.   Plaintiffs Gonzalez-Rodriguez and Lara-Martinez bring this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a) against Defendants for violations of 18 U.S.C. § 1589(a).

286.   18 U.S.C. § 1595(a) provides civil remedy for trafficking victims against any party that directly violates a section of the TVPRA or against "whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."

287.   18 U.S.C. § 1589(a) prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means:

45

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

288.   "Serious harm" is "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstance, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

289.   "Abuse or threatened abuse of the legal process" is the "use or threatened use of the law or legal process...in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person."  18 U.S.C. § 1589(c)(1)

290.   In 2019, Defendants, through the acts of their agents and employees, knowingly used force and threats of force against Plaintiff Gonzalez-Rodriguez to obtain her labor and services.

291.   In 2020, Defendants, through the act of their agents and employees, knowingly used implied threats of force against Plaintiff Lara-Martinez to obtain her labor and services.

292.   In 2019 and 2020, Defendants, through the acts of their agents and employees, knowingly threatened with serious harm, including financial, reputational, and legal harm, Plaintiffs and their families, to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. § 1589(a)(2).

293.    In 2019 and 2020, Defendants, directly and through the acts of their agents and employees, knowingly obtained Plaintiffs' labor through abuse of the legal process by including false information in the Clearance Orders and thereby using the H-2A program in a manner for which the law was not intended.

294.    In 2019, Defendants, directly and vicariously through the acts of their agents and employees, knowingly threatened Plaintiff Gonzalez-Rodriguez with the abuse of law or legal process, including threatening her with arrest, deportation, and reporting her to U.S. Federal government officials, to obtain her labor and services in violation of 18 U.S.C. § 1589(a)(3).

295.    In 2020, Defendants, directly and through the act of their agents and employees, knowingly caused Plaintiff Lara-Martinez to fear legal and reputational consequences for herself and her husband through abuse of the law to obtain her labor and services in violation of 18 U.S.C. § 1589(a)(3).

296.    In 2019 and 2020, Defendants, directly and through the act of their agents and employees, implemented a scheme, pattern, or plan which included false promises, withholding documents, limiting access to food, denial of medical care, isolation, monitoring of Plaintiffs, aggression towards other Gracia kitchen workers, debt, control over Plaintiffs' money and movement, physical and verbal abuse, and other acts directed towards Plaintiffs, to cause them to believe that they or their families would experience serious harm if they did not continue to work in the Gracia labor camp kitchens.

297.    Defendants intended to, and did, benefit from the compelled labor of Plaintiffs.

**SIXTH CLAIM FOR RELIEF**

(TVPRA – TRAFFICKING)

298.　Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

299.　Plaintiffs bring this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a), against Defendants for violations of 18 U.S.C. § 1590.

300.　18 U.S.C. § 1590 provides that it is unlawful to knowingly recruit, harbor, transport, provide, or obtain "by any means, any person for labor or services in violations of laws prohibiting peonage, slavery, involuntary servitude, and forced labor" within the meaning of the provisions of the TVPRA.

301.　Defendants, by and through their agents, knowingly recruited, provided, or obtained Plaintiffs' labor by various fraudulent and/or coercive means including:

    a.　Knowingly making false representations on the 2019 Applications and accompanying 2019 Clearance Orders submitted to USDOL for approval;

    b.　Knowingly making false representations on the 2020 Applications and Clearance Orders submitted to USDOL for approval;

    c.　Making fraudulent promises to Plaintiffs regarding the terms of their living and/or working conditions in the U.S.;

    d.　Making fraudulent promises to Plaintiff Gonzalez-Rodriguez regarding the length of her visa to work with them in the U.S.;

    e.　Ensnaring Plaintiff Gonzalez-Rodriguez in debt in reliance on Defendants' promises of reimbursement in furtherance of their trafficking scheme;

f.  Controlling Plaintiffs' access to food and medical care;

g.  Threatening Plaintiffs verbally, directly and indirectly.

302.  Defendants intended to benefit from their trafficking scheme.

303.  Through these activities, the Defendants knowingly recruited, transported, and harbored Plaintiffs to obtain their labor or services by:

a.  Means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

b.  Means of serious harm or threats of serious harm to that person or another person;

c.  Means of the abuse or threatened abuse of law or legal process; and

d.  Means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

304.  For these violations, Plaintiffs have suffered injury and are entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## SEVENTH CLAIM FOR RELIEF

### (TVPRA: UNLAWFUL CONDUCT IN RESPECT TO DOCUMENTS IN FUTHERANCE OF TRAFFICKING)

305.  Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

306.  Plaintiffs bring this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a), against Defendants for violations of 18 U.S.C. § 1592.

49

307.    18 U.S.C. § 1592 establishes liability for anyone who "destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person,

> (1) in the course of violating Sections...1589, [or] 1590...;
>
> (2) with the intent of violating Sections...1589, [or] 1590...; or
>
> (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons."

308.    Defendants knowingly removed and possessed Plaintiffs' I-94 immigration forms, passports containing their H-2A visas, and Mexican voting credential documents.

309.    Plaintiffs suffered injury as a result of this violation and are entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## EIGHTH CLAIM FOR RELIEF

### (TVPRA: UNLAWFUL CONDUCT WITH RESPECT TO IMMIGRATION DOCUMENTS)

310.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

311.    Plaintiffs bring this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a), against Defendants for violations of 18 U.S.C. § 1597.

312.    Section 1597 of the TVPRA prohibits, "knowingly destroy[ing], conceal[ing], remov[ing], confiscat[ing], or possess[ing], an actual or purported passport or other immigration document

of another individual" in the course of fraud in foreign labor contracting, with the intent of committing fraud in foreign labor contracting, or "in order to, without lawful authority, maintain, prevent, or restrict the labor or services of the individual."

313. Defendants knowingly confiscated Plaintiffs' I-94 immigration forms and passports in the course of using false pretenses to employ Plaintiffs and in order to maintain Plaintiffs' labor with Defendant Gracia Harvesting.

314. For these violations, Plaintiffs have suffered injury and are entitled to recover damages, including punitive damages and attorneys' fees, pursuant to 18 U.S.C. § 1595(a).

## NINTH CLAIM FOR RELIEF

### (NORTH CAROLINA HUMAN TRAFFICKING LAW)

315. Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

316. Plaintiffs bring this civil claim pursuant to the civil remedy provisions of the North Carolina Human Trafficking Act, N.C. Gen. Stat. § 14-43.18.

317. The North Carolina Human Trafficking Act defines human trafficking as: "knowingly or in reckless disregard of the consequences of the action recruit[ing], entic[ing], harbor[ing[, transport[ing], provid[ing], or obtain[ing] by any means another person with the intent that the other person be held in involuntary servitude." N.C. Gen. Stat. § 14-43.11.

318. Involuntary servitude is the performance of labor "by deception, coercion, or intimidation using violence or the threat of violence or by any other means of coercion or intimidation." N.C. Gen. Stat. § 14-43.10.

319. Coercion includes:

a. "causing or threatening to cause bodily harm to any person, physically restraining or confining any person, or threatening to physically restrain or confine any person[;]

b. Exposing or threatening to expose any fact or information that if revealed would tend to subject a person to criminal or immigration proceedings, hatred, contempt, or ridicule[; or]

c. Destroying, concealing, removing, confiscating, or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of any person." N.C. Gen. Stat. § 14-43.10.

320. Defendants, directly and vicariously, by and through their agents, knowingly recruited, provided, or obtained the labor of Plaintiffs by various deceptive and/or coercive means including:

a. Knowingly making false representations on the 2019 Applications and accompanying 2019 Clearance Orders submitted to USDOL for approval;

b. Knowingly making false representations on the 2020 Applications and Clearance Orders submitted to USDOL for approval;

c. Making fraudulent promises to Plaintiffs regarding the terms of their living and/or working conditions with them in the U.S.;

d. Making fraudulent promises to Plaintiff Gonzalez-Rodriguez regarding the length of her visa to work with them in the U.S.;

e. Ensnaring Plaintiff Gonzalez-Rodriguez in debt in reliance on Defendants' promises of reimbursement in furtherance of their trafficking scheme;

f. Controlling Plaintiffs' access to food and medical care;

g.   Causing Plaintiffs to believe they could be arrested for quitting their employment with Defendant Gracia Harvesting;

h.   Threatening to report Plaintiffs to federal immigration control officers or other similar law enforcement;

i.   Causing Plaintiff Gonzalez-Rodriguez to fear physical and financial harm for her family;

j.   Causing Plaintiff Lara-Martinez to fear financial and reputational harm for herself and her husband; and

k.   Threatening Plaintiffs indirectly through their acts of harm towards other workers in view of Plaintiffs.

321.   For these violations, Plaintiffs have suffered injury and are entitled to recover damages, including punitive damages, and attorneys' fees, pursuant to N.C. Gen. Stat. § 14-43.18.

## TENTH CLAIM FOR RELIEF

### (FRAUDULENT INDUCEMENT)

322.   Plaintiff Gonzalez-Rodriguez incorporates each of the allegations contained in the preceding paragraphs by reference.

323.   Plaintiff Gonzalez-Rodriguez brings this claim against Defendants. This claim arises under the common law of torts.

324.   Defendants, personally and through their agents, knowingly included false misrepresentations in their 2019 and 2020 Orders. These false misrepresentations included, among other things:

53

a.   that Defendants would pay Plaintiff Gonzalez-Rodriguez $12.25 per hour for all = hours of work each workweek, with a chance of earning additional prevailing piece-rate wages.

b.   that Defendants would pay and/or reimburse Plaintiff Gonzalez-Rodriguez's incurred travel costs.

325.   These representations were false and were known by Defendants to be false at the time that Defendants recruited Plaintiff Gonzalez-Rodriguez.

326.   The Defendants made these false misrepresentations reasonably calculated to deceive Plaintiffs.

327.   Defendants made false misrepresentations intending that Plaintiff Gonzalez-Rodriguez rely upon them to induce Plaintiff Gonzalez-Rodriguez to front significant visa and travel-related costs to travel from her hometown to North Carolina to work for Defendants.

328.   The false misrepresentations were material.

329.   In reliance upon the Defendants' false misrepresentations, Plaintiff Gonzalez-Rodriguez took out interest-accruing loans to travel to Defendant Gracia Harvesting's place of employment.

330.   Plaintiff Gonzalez-Rodriguez experienced injury because of her reliance on Defendants' false statements and misrepresentations, which caused her to leave her home, family, and employment in Mexico and come to the U.S., where she did not receive her promised wages and working and living conditions.

331.   As a result of Defendants' false misrepresentations, Plaintiff Gonzalez-Rodriguez suffered damages.

54

## ELEVENTH CLAIM FOR RELIEF

### (NEGLIGENT MISREPRESENTATION)

332.   Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

333.   Plaintiffs bring this claim against Defendants. This claim arises under the common law of torts.

334.   Defendants, personally and through their agents, made written and oral material misrepresentations to Plaintiffs while recruiting them as H-2A workers for work with Defendants in the U.S. These misrepresentations included, among other things:

    a.   That Defendants would pay Plaintiffs the AEWR per hour for all their hours of work each workweek;

    b.   That Defendants would comply with local, state, and federal laws, including laws prohibiting discrimination on the basis of sex;

    c.   That Defendants would pay and/or reimburse Plaintiff Gonzalez-Rodriguez's visa, transportation, border crossing, and subsistence expenses; and

    d.   That Plaintiffs would work in the fields, where they would have the opportunity to earn a prevailing piece rate, if above the AEWR hourly wage.

335.   Defendants failed to exercise reasonable care in providing information to Plaintiffs about the job that they knew may be material to Plaintiffs' decisions to incur expenses and travel to the U.S. to come work for Defendants.

336.   Plaintiffs were injured because of their reliance on Defendants' and their agents' false statements and misrepresentations. Defendants' false statements and misrepresentations caused them to pay for travel and leave their homes, families, and employment in Mexico and

come to the U.S. where they were not given their promised wages, working conditions, or living conditions.

337.    As a result of the Defendants' misrepresentations, Plaintiffs suffered damages.


## JURY DEMAND

338.    Plaintiffs demand a trial by jury on all issues so triable.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an order:

1. Finding that this Court has jurisdiction over Plaintiffs' claims;

2. Granting a jury trial on all issues so triable;

3. Declaring that Defendants, by the acts and omissions describe above, willfully violated Plaintiffs' rights under the minimum wage provision of the FLSA at 29 U.S.C. 206(a) as set forth in Plaintiffs' First Cause of Action.

4. Granting judgment in favor of Plaintiffs on their FLSA claims and awarding Plaintiffs' monetary damages for unpaid minimum wages and unpaid overtime, plus liquidated damages in an equal amount and interest, court costs, and attorneys' fees, as provided by FLSA § 216(b);

5. Declaring that Defendants, by the acts and omission described above, violated Plaintiffs' rights under the provision of the North Carolina Wage and Hour Act, as set forth in Plaintiffs' Second Cause of Action.

6. Granting judgment in favor of Plaintiffs on their NCWHA claims and awarding Plaintiffs' monetary damages for unpaid minimum wages and unpaid overtime, plus liquidated

damages in an equal amount and interest, court costs, and attorneys' fees, as provided by N.C. Gen. Stat. § 95-25.6.

7. Granting judgment in favor of Plaintiffs on their contract claim as set forth in their Third Cause of Action and awarding them their damages for Defendants contractual breaches.

8. Declaring that Defendants, by the acts and omissions described above, violated Plaintiffs' rights under the TVPRA at 18 U.S.C. §§ 1589, 1590, 1592, and 1597 as set forth in Plaintiffs' Fifth, Sixth, Seventh, and Eighth Causes of Action.

9. Granting judgment in favor of Plaintiffs, for each of their TVPRA claims, and awarding the amount of their damages, including punitive damages, and attorney's fees;

10. Granting judgment in favor of Plaintiffs, for their North Carolina Human Trafficking claims, and awarding the amount of their damages, including punitive damages, and attorney's fees;

11. Granting judgment in favor of Plaintiff Gonzalez-Rodriguez on her tortious fraudulent inducement claim as set forth in the Tenth Cause of Action and awarding her damages for Defendants' conduct;

12. Granting judgment in favor of Plaintiffs on their tortious negligent misrepresentation claim as set forth in their Eleventh Cause of Action and awarding them their damages for Defendants' conduct;

13. Awarding Plaintiffs pre- and post-judgment interest, as allowed by law;

14. Awarding Plaintiffs their costs; and

15. Granting such injunctive, declaratory, and further relief as this Court deems just and appropriate.

57

Respectfully submitted,

/s/ Holly N. Thompson
Holly N. Thompson
North Carolina State Bar No. 55196
E-mail: hollyt@legalaidnc.org
Legal Aid of North Carolina
P.O. Box 1728
Pittsboro, NC 27312

## Index of Exhibits

| | |
|---|---|
| Exhibit A | FLSA Consent to Sue, signed by Plaintiff Lucia Gonzalez-Rodriguez |
| Exhibit B | FLSA Consent to Sue, signed by Plaintiff Nazaria Lara-Martinez |
| Exhibit C | The 2019 Order |
| Exhibit D | The 2020 Order |
| Exhibit E | USDOL WHD Consent Order |
| Exhibit F | Clearance Orders filed by Andrew Jackson on behalf of Defendants |